## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

BENJAMIN BISHOP,

                    Plaintiff,

   v.

UNIVERSITY OF SCRANTON, et al.,

                Defendants.

CIVIL ACTION NO. 3:22-CV-01831

(MEHALCHICK, M.J.)

### MEMORANDUM

Presently before the Court a motion to dismiss brought by Defendants University of Scranton (the "University") and Jeffrey Gingerich ("Provost Gingerich") ("University Defendants") (Doc. 13), and motion to dismiss brought by Defendant University of Scranton Faculty Affairs Council (the "FAC") (Doc. 15). On November 16, 2022, Plaintiff Benjamin Bishop ("Bishop") initiated this action by filing the complaint pursuant to 28 U.S.C. § 1331 and 1343. (Doc. 1). The parties have consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 18). For the following reasons, Defendants' motions to dismiss shall be GRANTED, and Plaintiff shall be granted 28 days to file an amended complaint. (Doc. 13; Doc. 15).

I.    **BACKGROUND AND PROCEDURAL HISTORY**

The events giving rise to this action, as set forth in the complaint, are as follows. At all times germane to this action, Bishop was a tenured full professor at the University and a member of the bargaining unit represented by the FAC. (Doc. 1, ¶¶ 9, 58). All parties were bound by the provision of the Faculty Handbook of the University dated May 24, 2021. (Doc. 1, ¶ 10, at 19-115). The Faculty Handbook governs the relationship between the University and its faculty, including the practices and policies for dismissal of a tenured professor. (Doc.

1, ¶ 11). After the Faculty Hearing Committee held a hearing and recommended that the University terminate Bishop, Joseph Marina, President of the University, accepted the recommendation and terminated Bishop's employment on May 10, 2022, for refusing to disclose his COVID-19 vaccination status. (Doc. 1, ¶ 13, at 117). According to the complaint, Bishop was fully vaccinated, but "did not believe that it was the Defendant's right to compel him to disclose his vaccination status." (Doc. 1, ¶ 14, at 119).

On November 16, 2022, Bishop filed the complaint against the University, Gingerich, and the FAC (collectively, "Defendants"). (Doc. 1). In the complaint, Bishop asserts the following causes of action: compulsion of political speech against the University (Count I); violation of the rights to privacy and body autonomy found in the Fourteenth Amendment against the University (Count II); wrongful dismissal in violation of Pennsylvania public policy against the University (Count III); breach of contract against the University (Count IV); violation of rights to due process against the University (Count V); violation of right to be free from selective enforcement against the University (Count VI); defamation against the University and Provost Gingerich (Count VII); and breach of duty of fair presentation against the FAC (Count VIII). (Doc. 1, at 4-15). For relief, Bishop requests compensatory damages, as well as attorney's fees. (Doc. 1, at 16).

On January 30, 2023, University Defendants filed a motion to dismiss the complaint, as well as a brief in support. (Doc. 13; Doc. 14). On the same day, the FAC filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), as well as a brief in support. (Doc. 15; Doc. 16). On March 17, 2023, Bishop filed briefs in opposition to Defendants' motions to dismiss. (Doc. 25; Doc. 26). The FAC filed a reply brief on March 30, 2023, and the University and Gingerich filed a reply brief on March 31, 2023. (Doc. 27; Doc. 28).

The motions to dismiss has been fully briefed and are ripe for disposition. (Doc. 14; Doc. 16; Doc. 25; Doc. 26; Doc. 27; Doc. 28).

II.     **MOTION TO DISMISS STANDARDS**

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint are true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). Although a court must accept the factual allegations in a complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Additionally, a court need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In *Ashcroft v. Iqbal*, the United States Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. 662, 679 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss, a court may consider the facts alleged on the face of the complaint, as well

as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

III. **DISCUSSION**

In the complaint, Bishop brings this action pursuant to 28 U.S.C. § 1331 and 1343 and raises seven causes of action against the University, one cause of action against Provost Gingerich, and one cause of action against the FAC. (Doc. 1). Defendants move to dismiss the claims raised in Bishop's complaint pursuant to Rule 12(b)(6). (Doc. 14; Doc. 16). The Court will address each motion to dismiss separately.

A. UNIVERSITY DEFENDANTS' MOTION TO DISMISS

University Defendants set forth the following arguments for dismissal: (1) Bishop's constitutional claims must be dismissed where he has not alleged that the University is a state actor; (2) Bishop's constitutional claims must be dismissed where he has not alleged a violation of his constitutional rights; (3) Bishop's wrongful termination claim must be dismissed "where his [c]omplaint alleges that his termination was *consistent* with Pennsylvania public policy;" (4) Bishop's breach of contract claim must be dismissed "where it is preempted by federal law, impermissibly challenges the *outcome* rather than the *process* of his termination proceedings, and where he was terminated for adequate cause;" (5) Bishop's contractual due process claim must be dismissed "where he was provided with all process required by the Faculty Handbook;" and (6) Bishop's defamation claim must be dismissed "where it is preempted by federal law and where [Bishop] has only alleged non-actionable statements of opinion." (Doc. 14, at 14-15).

1. **Counts I, II, and VI**

In Counts I, II, and VI of the complaint, Bishop asserts that the University violated his

constitutional rights under the First and Fourteenth Amendments, thus entitling him to a recovery under 42 U.S.C. § 1983. (Doc. 1, at ¶¶ 15-33, 48-51). To assert a viable claim under § 1983, Bishop "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added). "The color of state law element is the threshold issue; there is no liability under § 1983 for those not acting under color of law." *Groman v. Twp. of Malapan*, 47 F.3d 628, 638 (3d Cir. 1995). Here, the University moves to dismiss Bishop's § 1983 claims on the basis that he has not alleged facts sufficient to plausibly show that the University was a state actor.

"[W]hether a defendant is acting under color of state law—i.e., whether the defendant is a state actor—depends on whether there is 'such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.' " *Chetty v. Sardella*, No. 22-CV-1549, 2022 WL 2048661, at *2 (E.D. Pa. June 7, 2022) (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)). In this undertaking, the United States Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state," (2) "whether the private party has acted with the help of or in concert with state officials," and (3) "whether the State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted). Here, the University does not qualify as a state actor under any of the tests.

The question under the first test "is whether the function performed has been

traditionally the exclusive prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (internal quotations omitted). This test imposes a "heavy burden" that is rarely met. *Kach*, 589 F.3d at 648; *see also Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 165 (3d Cir. 2001) (holding that the first "test imposes a rigorous standard that is rarely satisfied"). Functions held to be the exclusive prerogative of the state include administration of elections of public officials, *Terry v. Adams*, 345 U.S. 461, 468–70 (1953), operation of a company-owned town, *Marsh v. Alabama*, 326 U.S. 501, 505–09 (1946), "the forcible removal of children from their homes," *Est. of Adam Earp v. City of Phila.*, No. 96-CV-7141, 1997 WL 255506, at *2 (E.D. Pa. May 7, 1997), and "internal affairs investigations of police officers," *Beu v. City of Vineland*, No. 20-CV-02510, 2020 WL 7418007, at *11 (D.N.J. Dec. 18, 2020).

In response to the motion to dismiss, Bishop argues that when the University adopted the Royals Safe Together policy, which "mirrors" the federal and state government policies regarding vaccination, testing, and masking, the University "acted under color of state law because it was performing a traditional public function—creating healthcare policies designed to prevent the spread or transmission of a virus." (Doc. 25, at 14-15). Bishop contends that "[t]he implementation of alleged health and safety policies during a pandemic are functions that are traditionally the exclusive prerogative of the state." (Doc. 25, at 14) (quotation marks omitted). However, Bishop has failed to identify a single case in which a private school was considered a state actor. "[C]ourts have overwhelmingly held that private schools and colleges are not state actors, irrespective of whether they receive government funding." *Comegys v. Valley Forge Mil. Acad. & Coll.*, No. CV 21-3848, 2022 WL 3229329, at *5 (E.D. Pa. Aug. 10, 2022); *see also Stetson Sch.*, 256 F.3d at 165 (3d Cir. 2001) ("[I]t is clear that Stetson's receipt of government funds did not make it a state actor."); *Albert v. Carovano*, 851 F.2d 561, 571 (2d

Cir. 1988); *Berrios v. Inter Am. Univ.*, 535 F.2d 1330, 1332 (1st Cir. 1976) ("The district court properly refused to take into account financial assistance from the federal government in considering the presence of state action."); *Blouin v. Loyola Univ.*, 506 F.2d 20 (5th Cir. 1975); *Grafton v. Brooklyn L. Sch.*, 478 F.2d 1137 (2d Cir. 1973); *Becker v. City Univ. of Seattle*, 723 F. Supp. 2d 807, 811 (E.D. Pa. 2010) ("[The plaintiff] has failed to identify a single case in which higher education has been deemed a traditional public function, and the Court's own research has verified that none exists."); *Fisher v. Driscoll*, 546 F. Supp. 861, 866 (E. D Pa. 1982) ("[T]he small amount of state funds received by Villanova do not make the University's conduct state action.").

Consistent with well-settled precedent, the Court rejects Bishop's assertion that the University's adoption of a policy similar to the federal and Pennsylvania health regulation regarding COVID-19 converted the University's action into that of the state for the purposes of Bishop's constitutional claims. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for the purposes of the Fourteenth Amendment."). The Supreme Court has found no merit in the argument that extensive state regulation of a school was sufficient to make it a state actor, because the challenged conduct by a private school "was not compelled or even influenced by any state regulation." *Rendell-Baker*, 457 U.S. at 841. Furthermore, in *Finkbeiner v. Geisinger Clinic*, this Court held that Pennsylvania's "duty to protect the health of the people and employ the most effective methods of disease suppression is not exclusive," and healthcare providers are not prohibited from doing more than the state-mandated minimum to protect their patients and staff. No. 4:21-CV-01903, 2022 WL 3702004, at *5-6 (M.D. Pa. Aug. 26, 2022). Bishop has not met his heavy burden of showing

that it was a state actor under the first test. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.' "); *Stetson Sch., Inc.*, 256 F.3d at 165 (noting that the first "test imposes a rigorous standard that is rarely satisfied" (ellipsis, internal quotation marks and citation omitted)).

The second test is "whether the private party has acted with the help of or in concert with state officials." *Kach*, 589 F.3d at 646. Under this test, "courts must ask first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1143 (3d Cir. 1995) (internal citation and quotations omitted). Examples of state action under this test include an employee conspiring with a police officer to racially discriminate against a patron, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970), and a private party's joint participation with state officials to seize a disputed property, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

Bishop submits that the University is a state actor because it "followed the deep and continuous encouragement of various U.S. agencies" and "Pennsylvania state officials" that "encourage[ed] private employers to require vaccination." (Doc. 1, ¶¶ 21-22). In opposition to the instant motion, Bishop alleges the government helped in the adoption of the Royals Back Together plan because it is "in keeping with," "aligned with," or "informed by" guidance from the Centers for Disease Control and Prevention. (Doc. 25, at 15). However, Bishop does not allege facts demonstrating that the University and the state jointly agreed to adopt the Royals Back Together plan, or that the decision "resulted from the exercise of a

right or privilege having its source in state authority." *Mark*, 51 F.3d at 1143. "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *Finkbeiner*, 2022 WL 3702004, at *6 (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999)). Thus, the University does not meet the definition of a state actor under the second test.

The third test is "whether the State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach*, 589 F.3d at 646. In *Burton v. Wilmington Parking Authority*, the United States Supreme Court found, under this test, that a restaurant that practiced racial discrimination and was located within a public parking garage was a state actor because the state had many "obligations and responsibilities" regarding the operation of the restaurant, "mutual benefits" were conferred, and the restaurant operated "as an integral part of a public building devoted to a public parking service." 365 U.S. 714, 724 (1961). The Supreme Court later applied the *Burton* test to a high school athletic association in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), finding state action because a "great majority of the association's member schools were public, representatives of the schools acting in their official capacities selected members of the association's governing bodies, [and] state officials also sat on those bodies in an *ex officio* capacity." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 172-73 (3d Cir. 2004) (citing *Brentwood*, 531 U.S. at 298-300). Moreover, "the association was largely financed by gate receipts from member-school tournaments, and association employees participated in the state retirement system." *Benn*, 371 F.3d at 172-73.

Nothing in Bishop's complaint suggests that the state has "insinuated itself into a

position of interdependence" with the University, as *Kach*'s third test requires. *See* 589 F.3d at 646. Under that test, "state action will be found if there is a sufficiently close nexus between the state and the *challenged* action of the regulated entity so that the action may be fairly treated as that of the State itself." *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 76 (3d Cir. 1991) (emphasis in original and internal quotation marks and citation omitted). "[T]he purpose of this requirement is 'to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains.'" *Boyle*, 925 F.2d at 76 (some emphasis in original) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). "Acts of private contractors do not become acts of the State simply because they are performing public contracts. The State will be held responsible for a private decision only when it has *exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State*." *Boyle*, 925 F.2d at 76 (emphasis supplied and internal quotation marks and citations omitted).

Bishop claims the University "became a state actor after following the deep and continues encouragement of Pennsylvania state officials encouraging private employers to require vaccination." (Doc. 1, ¶ 22). Further, Bishop attempts to argue that "the government is a joint participant" in the Royals Back Together plan and that the University "established its COVID-19 policies by aligning with the CDC's guidelines and recommendations." (Doc. 25, at 16). These assertions do not reach the degree of involvement and interdependence present in *Burton* and *Brentwood*. Bishop does not allege the state knew about, let alone agreed to, the Royals Back Together plan. Therefore, Bishop's complaint does not show a connection between the University and the state to satisfy the definition of a state actor under the third *Kach* test.

In sum, Bishop has failed to allege sufficient facts to establish that the University could be considered a state actor for § 1983 purposes. Thus, the conduct being challenged here, as pleaded, was not undertaken "under color of law." The complaint lacks factual allegations to support the conclusion that the University is a state actor. Accordingly, University Defendants' motion to dismiss is granted with respect to Bishop's § 1983 constitutional claims.

### 2. Count III

In Count III of the complaint, Bishop asserts a wrongful termination claim against the University for violating Pennsylvania's public policy regarding religious freedom and compulsion of political speech. (Doc. 1, ¶¶ 34-36). Employment in Pennsylvania is typically at-will. *See McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (2000) ("[T]he presumption of all non-contractual employment relations is that it is *at-will* and that this presumption is an extremely strong one.") (emphasis in original); *White v. FedEx Corp.*, No. 1:19-CV-00325, 2019 WL 5102168, at *4 (M.D. Pa. Oct. 11, 2019) ("In the context of an employment-at-will relationship, Pennsylvania courts have long recognized that an employer may terminate an employee for any reason absent a contractual or statutory provision to the contrary.") (citing *McLaughlin*, 750 A.2d at 286). There is one exception to this general rule: when a termination violates a "clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (2009). This exception applies "only in the most limited circumstances," and "the power of the courts to declare pronouncements of public policy is sharply restricted." *Weaver*, 975 A.2d at 563 (citing *Mamlin v. Genoe*, 17 A.2d 407, 409 (1941)). The Supreme Court of Pennsylvania has instructed that a court should utilize the public policy exception "[o]nly in the clearest of cases." *Weaver*, 975 A.2d at 563.

What constitutes "public policy" in the Commonwealth is determined by reference to judicial decisions of Pennsylvania courts, the Pennsylvania constitution, and statutes promulgated by the Pennsylvania legislature. *McLaughlin*, 750 A.2d at 288. An employee's subjective belief that his termination violated public policy is not sufficient: "[A]bsent a violation of law, it is difficult for an at-will employee seeking recovery for wrongful discharge to point to a common law, legislative, or constitutional principle from which a clear public policy [mandate] could be inferred." *Clark v. Modern Grp., Ltd.*, 9 F.3d 321, 328 (3d Cir. 1993). Accordingly, "Pennsylvania courts have recognized the public policy exception where the employer: (1) compels the employee to engage in criminal activity; (2) prevents the employee from complying with a duty imposed by statute; or (3) discharges the employee when a statute expressly prohibits such termination." *Zorek v. CVS Caremark Corp.*, No. 1:13-CV-1949, 2014 WL 12487695, at *3 (M.D. Pa. Apr. 16, 2014) (citing *Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 738 (E.D. Pa. 2011)).

University Defendants argue that this claim is fatally flawed for two reasons. First, University Defendants argue Bishop's claim must be dismissed because it is "preempted by federal labor law since the Faculty Handbook is a collective bargaining agreement," and "the Pennsylvania Superior Court has held as a matter of substantive law that a cause of action for wrongful discharge in violation of public policy is not available for unionized employees." (Doc. 14, at 23-24) (citing *Ciferni v. Day & Zimmerman, Inc.*, 529 F. App'x 199, 202-04 (3d Cir. 2013)). Second, University Defendants argue that Bishop fails to identify any public policy that would prevent the University from terminating him for refusing to follow the Royals Back Together plan. (Doc. 14, at 24). To the extent Bishop vaguely alleges that his termination violated Pennsylvania law against compulsion of speech and religious freedom, University

Defendants assert that Bishop "was not compelled to speak nor required to engage in symbolic speech," and Bishop "alleges no other facts concerning his religion or how it relates to the facts at issue in this cause nor what Pennsylvania law could have been violated." (Doc. 14, at 24 n.4).

In response, Bishop concedes that "[w]hile [Bishop] acknowledges that there is no crime or statute that relates to [his] conduct, the University violated a clear mandate of public policy in terminating [Bishop] after he was vaccinated in accordance with the University's COVID-19 policy, which was created in conformity with the CDC guidelines in place at the time." (Doc. 25, at 20). Bishop submits that he "complied with public policy, the University's guidelines, CDC guidelines and state guidelines with regard to vaccination," because he did, in fact, get vaccinated. (Doc. 25, at 20-21).

Under Pennsylvania law, "union employees subject to collective bargaining agreements may not pursue wrongful discharge claims against former employers." *Coppola v. Jneso–Pocono Med. Ctr.,* 400 F. App'x 683, 684 (3d Cir.2010); *see also Black v. Cmty. Educ. Ctr., Inc.*, No. 13-CV-6102, 2014 WL 859313, at *4 (E.D. Pa. Mar. 4, 2014) (dismissing wrongful termination claim brought by employee subject to a collective bargaining agreement). Bishop does not provide any argument as to the validity of the arbitration provision in the FAC, a collective bargaining agreement. Further, Bishop does not provide any argument that directly counters the clear Pennsylvania case law holding that wrongful termination claims are only available to at-will employees, and he does not argue that he was ever an at-will employee of the University.

Accordingly, University Defendants' motion to dismiss is granted with respect to Count III of the complaint.

### 3. Counts IV and V

In Counts IV and V of the complaint, Bishop asserts a breach of contract claim and violation of due process claim against the University based on the Faculty Handbook. (Doc. 1, ¶¶ 37-43, 44-47). In Count IV, Bishop contends the University breached the Faculty Handbook because he was terminated "for reasons which were not related, directly and substantially, to the fitness of [Bishop] in his professional capacity as a teacher and researcher;" and "because of his exercise of his rights as an American citizen as allowed by the faculty handbook." (Doc. 1, ¶¶ 41-42). Specifically, Bishop asserts:

> The University breached the agreement between [Bishop] and the University, because [Bishop] was terminated ostensibly for refusing to disclose his vaccination status which is not dismissal for adequate cause. While Jeffrey Gingerich stated at the termination hearing that [Bishop] was bring terminated because of a violation of Section 5.4L of the Faculty Handbook, which states that the general responsibilities of full-time faculty members require "[m]aintenance of a high standard of conduct, integrity, trust, and professionalism when dealing with students, other faculty, staff, administrators, and the public; . . ." the handbook does not indicate that this requirement is cause for termination. Moreover, no evidence was presented at the termination hearing that [Bishop] violated this particular section, especially because no medical evidence in regard to COVID-19 as presented at the termination hearing.

(Doc. 1, ¶ 39).

In Count V, Bishop alleges that the University failed to afford due process before terminating Bishop's employment because: (1) he was not allowed to be present at the hearing when his termination was considered; (2) he was not allowed to call witnesses or cross-examine witnesses on his behalf; (3) he was not allowed to present evidence at the proceeding; (4) the University failed to meet its burden of proving that he had done anything which would justify termination; (5) no witnesses were called to establish that he had done anything wrong; and (6) no witnesses were sworn in and no evidence was presented that he was guilty of any

wrongdoing. (Doc. 1, ¶¶ 46-47). Bishop contends "Provost Gingerich ran the meeting and presented unsworn testimony as to what he believed [Bishop] was guilty of to justify his termination." (Doc. 1, ¶ 47).

University Defendants argue that Bishop's claims in Count IV and V fail because he is a member of the FAC, a union, and the Faculty Handbook, a collectively-bargained for agreement, provides that the remedy for any grievances over the application of the Faculty Handbook is through the FAC's decision to grieve the issue and, in its discretion, to file for arbitration. (Doc. 14, at 25) (citing Faculty Handbook § 2 (recognizing FAC as a faculty bargaining unit), and Faculty Handbook § 16 (setting forth grievance and arbitration provisions)). University Defendants also argue that Bishop failed to follow the contractually-required process for grievances regarding the University's violation of the Faculty Handbook in its decision to terminate his employment. (Doc. 14, at 28). In addition, University Defendants submit that Bishop's due process claim fails because the procedure by which Bishop was terminated afforded him adequate process. (Doc. 14, at 28).

In opposition to the motion to dismiss, Bishop maintains that the University breached its contract with him when it terminated his employment. (Doc. 25, at 22). Bishop states that there was no evidence presented at the termination hearing to suggest he did not maintain a high standard of conduct, integrity, trust, and professionalism, and the Faculty Handbook does not provide that Section 5.4(L) is "adequate cause" for termination. (Doc. 25, at 22). Bishop also alleges that he followed the procedures set forth in the Faculty Handbook to challenge the termination process, but the University "breached its contract with [Bishop] by failing to adhere to its policies regarding academic freedom and for ostensibly retaliating against [Bishop]'s exercise of academic freedom." (Doc. 25, at 23, 25).

At the onset, it is clear that, to the extent that Counts IV and V are in an attempt to enforce the terms of the Faculty Handbook, and Defendants' duties arising therefrom, the claims are completely preempted by Section 301 of the Labor Management Relations Act ("LMRA"). Section 301 of the LMRA has been held to completely preempt the field of labor contracts such that any claim that requires interpretation of the terms of a CBA is deemed to be preempted by Section 301. *See Avco Corp. v. Aero Lodge, I.A.M. & A.W.,* 390 U.S. 557, 560 (1968) (finding that LMRA Section 301 completely preempts the field of labor contracts); *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208 (1985) ("questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort"). Indeed, even if Bishop alleged the claims were brought pursuant to the Pennsylvania law of contracts, the complete preemption doctrine requires that it be deemed a federal Section 301 claim. *Allis-Chalmers Corp.,* 471 U.S. at 210-11. Therefore, in light of the long-standing policy of complete preemption in the interpretation of labor contracts, Counts IV and V of Bishop's complaint are not sufficient to give this Court federal question jurisdiction.

To the extent Bishop brings state law claims arising from his termination from the University in violation of the Faculty Handbook and the University's alleged failure to afford Bishop sufficient process, such claims will be dismissed for failure to state a claim. In the complaint, Bishop alleges that the University breached the Faculty Handbook because he was dismissed for reasons not related, directly and substantially, to Bishop's fitness in his professional capacity as a teacher and researcher. (Doc. 1, ¶ 41).

Relevant here, Section 26.3 of the Faculty Handbook provides that "[t]ermination of

a tenured appointment, or of a special or probationary appointment before the end of the specified term, may be effected by the institution for only financial exigency, discontinuance of a program, national emergency or major catastrophe, or dismissal for adequate cause." (Doc. 1, at 72). The Faculty Handbook explains that "[a]dequate cause for a dismissal will be related, directly and substantially, to the fitness of the faculty member in the faculty member's professional capacity as a teacher and researcher. Dismiss will not be used to restrain faculty members in their exercise of academic freedom or other rights as American citizens." (Doc. 1, at 73).

Having reviewed the Faculty Handbook, the Court is persuaded by University Defendants' argument that the collective bargaining agreement is clear and unambiguous in setting out the process that is reserved to the University and its faculty for arriving at a conclusive determination as to whether Bishop's tenure should be terminated. While Bishop "is free to assert in a court a law that the process . . . that was afforded [to] him did not comply with the [Faculty Handbook]'s terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination." *Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 596, 777 A.2d 418, 433 (2001). Moreover, there is nothing in the Faculty Handbook to indicate that any of the judgments relating to a faculty member's continued employment with the University, or lack thereof, would be open to a judge or jury to override. Indeed, it would be unreasonable to believe that the parties intended that the process for deciding the matter of employment, which is so carefully discussed in the Faculty Handbook t the point of final determination, could be completely circumvented by the filing of a civil action. Rather, the detailed provisions of the Faculty Handbook for deciding the matter have inherent in them the intent of the collectively-bargaining parties that the agreed-upon process was to be final.

That intent, with respect to the finality of the process, is express and enforceable. Therefore, the Court finds that Bishop's breach of contract claim fails as a matter of law because he is not entitled to litigate the merits of his termination in this breach of contract action. That is to say, the questions as to whether he violated Section 5.4(L) of the Faculty Agreement and whether this violation should have resulted in his termination have been conclusively and finally decided.

Turning to Bishop's due process claim, the Court finds that Bishop has not plausibly alleged that he was deprived of the process required by the Faculty Handbook. In the complaint, Bishop claims the University violated his due process rights guaranteed by the Faculty Handbook because the University prevented him from attending his own termination hearing, thereby preventing him from calling witnesses or cross-examining witnesses. (Doc. 1, ¶¶ 46-47, 49, at 121; Doc. 25, at 27).

Contrary to Bishop's assertions, the Faculty Handbook does not provide him the right to introduce documentary evidence, call witnesses, or cross-examine witnesses. Rather, Appendix IV of the Faculty Handbook sets forth the procedural requirements relating to the dismissal of faulty members. (Doc. 1, at 88). In relevant part, Appendix IV provides that dismissal of a faculty member shall be initiated through a sequence of steps, including a formal hearing on the charges in which "[t]he burden of proof that adequate cause exists rests with the University and shall be satisfied only by clear and convincing evidence in the record considered as a while." (Doc. 1, at 88, 90). "If the faculty hearing waives a hearing, but denies the charges, or *asserts that the charges do not support a finding of adequate cause*, the Faculty Hearing Committee will evaluate all available evidence and rest its recommendation upon the evidence in the record." (Doc. 1, at 88-89). If the faculty member chooses to attend the

termination hearing, "the faculty member will be permitted to have an advisor from the University community and legal counsel of the faculty member's choosing," will have the right to produce witnesses as well as documentary and other evidence, and will have the right to confront and cross-examine all witnesses. (Doc. 1, at 90). "The Hearing Committee's recommendation will be based solely on the hearing record." (Doc. 1, at 91).

Here, Bishop's failure to attend the termination hearing is not a violation of the process described above. Prior to Bishop's termination hearing, he was advised that he could not participate remotely and that he would not be permitted to attend the hearing unless he wore a "higher-grade mask" and provided a negative COVID test result. (Doc. 1, ¶ 49, at 121; Doc. 25, at 28). Upon receiving this letter from the Faculty Hearing Committee, it appears Bishop chose not to attend the termination hearing, and thereby chose not to present evidence, call witnesses, or cross-examine witnesses. Bishop does not establish facts to suggest that the Faculty Hearing Committee precluded him from attending his termination hearing and the Court will not entertain conclusory, unsupported averments. The Faculty Handbook does not provide Bishop the right to introduce documentary evidence, call witnesses, or cross-examine witnesses if he elects not to attend the hearing where such evidence would be provided. As such, Bishop has not identified any requirement proscribed in the Faculty Handbook that was violated.

Accordingly, University Defendants' motion to dismiss is granted and Bishop's due process claim is dismissed.

### 4. Count VII

In Count VII of the complaint, Bishop asserts a defamation claim against the University and Provost Gingerich. (Doc. 1, ¶¶ 52-56). Bishop contends "Defendant's

employees implied that [Bishop] was guilty of criminal conduct by failing to disclose his vaccination status," and "subjected [Bishop] to ridicule and blackened his character." (Doc. 1, ¶¶ 55-56).

University Defendants move to dismiss Count VII of the complaint, arguing that Bishop's claims fail because "[t]he statements accorded to the University and Provost Gingerich were made in connection with the proceedings that led to his termination, and are accordingly preempted." (Doc. 14, at 32). In addition, University Defendants argue that Bishop's claims fail because the alleged statements do not amount to defamation as "they are statements of opinion based on disclosed facts." (Doc. 14, at 34). University Defendants maintain that neither statement implies anything about Bishop engaging in criminal conduct and, thus, are non-actionable as the basis for a defamation claim. (Doc. 14, at 34-35).

In response, Bishop states he has established that Provost Gingerich's statement is a defamatory statement that is capable of defamatory meaning because he "has pled that Gingerich made the statement in question, that Gingerich made the statement about [Bishop], that it was intended to be defamatory because it implied that he was guilty of criminal conduct, that the recipients would understand that it was made regarding [Bishop] and that [Bishop] was harmed as a result." (Doc. 25, at 30).

At the onset, in light of the dismissal of Bishop's constitutional claims, the Court must determine whether it has subject matter jurisdiction over this claim. Federal courts are courts of limited jurisdiction, and when there is a question related to the Court's subject matter jurisdiction, that question must be resolved as a threshold matter. *Zambelli Fireworks Mfg. Co., Inc. v. Wood,* 592 F.3d 412, 418 (3d Cir. 2010).

In *Eash v. Cty. of York, Pennsylvania*, the Count noted:

"To state a claim for defamation, a plaintiff must show: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." *Byars v. Sch. Dist. of Philadelphia*, 942 F. Supp. 2d 552, 563 (E.D. Pa. 2013) (citing 42 Pa.C.S. § 8343(a)). "Whether a communication is capable of defamatory meaning is a 'threshold issue' to be determined by the court." *Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) (quoting *Kurowski v. Burroughs*, 994 A.2d 611, 617 (Pa. Super. Ct. 2010)). "The statement must be examined in context to determine its likely effect on the reader, and the Court should evaluate the effect it is likely to produce in the minds of the average persons among whom it is intended to circulate." *Id.* (internal quotation marks and citations omitted).

450 F.Supp.3d 568, 581 (M.D. Pa. 2020).

The Court finds that Bishop's defamation claims fail to state a claim upon which relief may be granted. In the complaint, Bishop first alleges the University "criticized [Bishop] and stated that [Bishop] was acting improperly by refusing to disclose his vaccination status." (Doc. 1, ¶ 53). Second, Bishop also alleges Provost Gingerich "stated that [Bishop] was a danger to the health and safety of the campus both before and after [Bishop]'s termination hearing." (Doc. 1, ¶ 54). However, neither allegation identifies how the allegedly defamatory statements were published, the understanding by any recipients of its defamatory meanings, the understanding by any recipients of it as intended to be applied to Bishop, any special harm resulting to Bishop from its publication, or abuse of a conditionally privileged occasion.

The Court finds Bishop's argument that Provost Gingerich's statement implied he was unvaccinated and acting in a manner that was reckless to the campus is unpersuasive. "A statement is deemed to be defamatory 'if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession.'" *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (quoting *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Superior Ct. 2008)). "Importantly, only statements of fact, rather

than mere expressions of opinion, are actionable under Pennsylvania law." *Mzamane*, 693 F. Supp. 2d at 477 (quoting *Moore v. Cobb Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005)). Bishop's defamation claims do not adequately state a claim for defamation against the University and Provost Gingerich. Accordingly, University Defendants' motion to dismiss will be granted. (Doc. 13).

B. THE FAC'S MOTION TO DISMISS

The FAC moves to dismiss the complaint for failure to state a claim upon which relief may be granted. (Doc. 15). The FAC argues Bishop's complaint does not adequately allege that the FAC breached its duty of fair representation because Bishop does not address the fact that the FAC does not, and cannot, represent any faculty member in disciplinary proceedings. (Doc. 16, at 16). The FAC argues that "the [c]omplaint addresses only the disciplinary procedure and does not allege that [Bishop] fried a grievance to challenge his discharge after receiving the University President's decision on May 10, 2022." (Doc. 16, at 17). Lastly, the FAC asserts that Bishop's statement regarding an alleged conflict of interest fails because "[w]hen the University suspended [Bishop] pending his disciplinary proceeding, the University needed to find adjunct faculty to teach the courses previously scheduled for [Bishop]," and "[a]djuncts are the natural solution to unexpected temporary vacancies." (Doc. 16, at 17). In opposition, Bishop contends the allegations in the complaint are sufficient to establish that the FAC breached its duty of fair representation at this stage in the proceedings. (Doc. 26, at 12). Bishop states:

> FAC's conduct was arbitrary and in bad faith. There is no rational basis or explanation to explain why FAC would fail to represent [Bishop] when the University required [Bishop] to wear a "higher-grade mask" and provide a negative COVID test result to attend his own termination proceeding when the rest of the University students and faculty were not required to mask regardless of vaccination status. Moreover, the University refused to allow [Bishop] to

attend remotely. [Bishop] grieved this issue, along with the others referenced above, and FAC determined that none of his grievances had merit despite being violations of the collective bargaining agreement. Moreover, FAC acted in bad faith in recommending a close friend for [Bishop]'s teaching position rather than defending him. This act demonstrates hostility toward Plaintiff that clearly affected the union's ability to represent Plaintiff fairly.

(Doc. 26, at 12).

As explained above, state law claims requiring the enforcement and interpretation of collective bargaining agreements must be "brought under [Section] 301 and be resolved by reference to federal law." *Allis-Chalmers Corp.*, 471 U.S. at 210-11. Ordinarily, an employee who brings a claim against an employer for breach of a collective bargaining agreement is first required to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 163 (1983). However, an employee is not required to exhaust his remedies under the grievance procedures if the union breaches its duty of fair representation in connection with the grievance process. *DelCostello*, 462 U.S. at 164.

In Count VIII of the complaint, Bishop asserts a breach of fair representation claim against the FAC. (Doc. 1, ¶¶ 57-67). Bishop asserts that he is a member of the FAC's bargaining unit and, as such, the FAC "has the statutory duty to represent all members of the employee bargaining unit fairly." (Doc. 1, ¶¶ 58, 60). However, Bishop alleges that the FAC violated or breached its duty of fair representation because the FAC "did not fairly and adequately represent [Bishop] in the termination proceedings against him," and "its actions were arbitrary, discriminatory and were in bad faith." (Doc. 1, ¶¶ 59, 62). For example, Bishop avers that during the disciplinary action and remote hearing, Bishop requested to be able to confer privately with a faculty representative, but the FAC opposed his request "even though the university would have allowed [Bishop] to confer with a faculty representative."

(Doc. 1, ¶ 65). Further, Bishop contends "[t]he FAC allowed the administration to exclude [Bishop] from his own dismissal hearing," and "[a]n officer of the FAC had a gross conflict of interest because he lobbied to place a close friend in [Bishop]'s teaching position which jeopardized his ability to properly aid [Bishop]." (Doc. 1, ¶¶ 66-67). As a result of the FAC's alleged actions, Bishop claims he was improperly terminated from his position at the University and suffered monetary damages, as well as damage to his reputation. (Doc. 1, ¶ 64).

In order to state a claim for a violation of the duty of fair representation, Bishop must allege facts which demonstrate that the union's conduct was arbitrary, discriminatory or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "The mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious." *Bangura v. Pa. Soc. Servs. Union–SEIU 668*, 2012 WL 6628045, at *3 (E.D. Pa. Dec. 20, 2012) (quoting *Findley v. Jones Motor Freight*, 639 F.2d 953, 958 (3d Cir. 1981)). Instead, "proof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of compliance with the fair representation."

A union's actions will only be deemed arbitrary if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Bakos v. Am. Airlines, Inc.*, 748 F. App'x 468, 471-472 (3d Cir. 2018) (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Such a " 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (quoting *Air Line Pilots Ass'n Int'l*, 499 U.S. at 67). To show discrimination on part of the union, "a plaintiff must adduce substantial evidence of discrimination that is

intentional, severe, and unrelated to legitimate union objectives." *Bakos*, 748 F. App'x at 472 (quoting *Addington v. U.S. Airline Pilots Ass'n*, 791 F.3d 967, 984 (9th Cir. 2015) (internal quotation marks omitted)). To show bad faith on part of the union, a plaintiff must put forth "a showing of fraudulent, deceitful, or dishonest action." *Bakos*, 748 F. App'x at 472 (quoting *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001)). There are few facts alleged in the complaint to support a claim of fair representation beyond "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906, 908 (3d Cir.1997). "[T]he mere refusal of a union to take a complaint to arbitration does not establish a breach of duty, even if the member's claim was meritorious." *Findley,* 639 F.2d at 958; *see also Seborowski v. Pittsburgh Press Co.,* 188 F.3d 163, 169 (3d Cir. 1999). Nor is proof that a union acted negligently sufficient to support Plaintiff's claim. *Findley,* 639 F.2d at 959. Bishop must plead that the FAC's actions were arbitrary, discriminatory, or undertaken in bad faith. *Vaca,* 386 U.S. at 190.

Section 2.1 of the Faculty Handbook provides, in relevant part, that "in matters involving salary, hours of employment, and working conditions—including matters involving an interpretation of this handbook—the officers of FAC alone have the authority to speak on behalf of, and subsequently bind, the members of the bargaining unit." (Doc. 1, at 28). Appendix IV of the Faculty Handbook provides that the FAC's role in the disciplinary hearing is limited: "A FAC officer shall be permitted to attend the proceedings as an *observer*." (Doc. 1, at 89) (emphasis added). The charged faulty member is not represented by the FAC. Rather, the Faculty Handbook states that "[d]uring the hearing, the faculty member will be permitted to have an advisor from the University and legal counsel of the faculty member's choosing. However, the faculty member may have only one advocate who can speak during the

hearing." (Doc. 1, at 89). Thus, it is clear that the FAC does not have any active role in a termination or disciplinary hearing.

To the extent Bishop attempts to assert a claim against the FAC for not adequately representing him in the complaint/grievance/arbitration process, the complaint is devoid of any facts to establish that Bishop filed a complaint to challenge his termination after receiving the President's decision on May 10, 2022. Therefore, the complaint fails to properly allege that the FAC violated its duty of fair representation. Furthermore, conclusory allegations in Bishop's complaint that the FAC demonstrated a conflict of interest when an FAC officer suggested a close friend to replace Bishop is unavailing. (Doc. 1, ¶ 67). There is no definitive statement or other evidence regarding whether the FAC did in fact demonstrate a conflict of interest. *Hernandez v. United Steel Workers Ass'n*, No. 1:10-CV-1350, 2010 WL 5092979, at *4 (M.D. Pa. Dec. 8, 2010). Because the Faculty Handbook did not provide for representation by the FAC, the FAC's failure to represent Bishop in the underlying proceedings cannot be deemed arbitrary, discriminatory, or in bad faith.

Accordingly, the FAC's motion to dismiss will be granted. (Doc. 15).

C.  L̲e̲a̲v̲e̲ ̲t̲o̲ ̲A̲m̲e̲n̲d̲

The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Further, "[a] district court has 'substantial leeway in deciding whether to grant leave to amend.'" *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 564 F. App'x 672, 673 (3d Cir. 2014) (not precedential) (quoting *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)). The Court is mindful the Supreme Court's mandate that "where the courts are called upon to fulfill

their role as the primary guardians of the duty of fair representation, complaints should be construed to avoid dismissals and the plaintiff at the very least should be given the opportunity to file supplemental pleadings unless it appears beyond doubt that he cannot state a good cause of action." *Hernandez*, 2010 WL 5092979, at \*5 (quoting *Czosek v. O'Mara,* 397 U.S. 25, 27, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970)). Therefore, the Court will grant Bishop leave to file an amended complaint in an attempt to cure the deficiencies outlined herein. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Grayson*, 293 F.3d at 108.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Doc. 13; Doc. 15) are **GRANTED**. Bishop shall have 28 days to file an amended complaint setting forth allegations in support of this civil action against Defendants and curing the deficiencies outlined herein.

An appropriate Order follows.

BY THE COURT:

Dated: July 17, 2023

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**Chief United States Magistrate Judge**